## BALTIMORE & POTOMAC RAILROAD COMPANY v. FIFTH BAPTIST CHURCH.

IN ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Decided April 23d, 1883.

*Corporation—Damages—Legislative Grant—Nuisance.*

1. In an action at law damages may be recovered against a person who maintains a nuisance which renders the ordinary use and occupation of property physically uncomfortable to its owner; and if the cause of the annoyance and discomfort be continuous, equity will restrain it.
2. The measure of damages in an action at law against the maintenance of a nuisance affecting real estate is not simply the depreciation of the property. The jury are authorized also to take into consideration personal discomfort which may be caused by the nuisance, and any causes which produce a constant apprehension of danger in their estimate of damages, even if there be no arithmetical rule for the estimate.
3. Corporations are equally responsible with individuals to respond in damages for injuries caused by nuisances maintained by their servants by the authority of the corporation.
4. Corporations may recover as plaintiffs for injuries done to their property by a nuisance; and where the corporation plaintiff is a religious corporation, and its members suffer personal discomfort and apprehension of danger in the use of the corporate property, the corporation may recover for such injuries. A religious congregation has the same right to the comfortable enjoyment of its church for its own purposes, that a private individual has to the comfortable enjoyment of his house.
5. Legislative authority to a railroad company to bring its tracks within municipal limits and to construct shops and engine houses there, does not confer authority to maintain a nuisance.
6. Legislative authorization exempts from liability to suits civil or criminal, at the instance of the State; but it does not affect claims of private citizens for damages for special inconvenience and discomfort, not experienced by the public at large.

Action in the nature of an action on the case to recover damages for the discomfort occasioned by the establishment of a building for housing the locomotive engines of a railroad company, contiguous to a building used for Sunday schools and public worship by a religious society. The following is the statement of facts as prepared by the court:

The Fifth Baptist Church, the plaintiff in the court below,

was a religious corporation, created under the general· incorporation act of Congress in force in the District of Columbia. It owned a building in the city of Washington situated on D street, between Four-and-a-half and Sixth streets, which was erected and has been used· by it as a church for many years. The defendant in the court below, the Baltimore & Potomac Railroad Company, was a corporation created under the laws of Maryland, and was authorized ·by act of Congress to lay its track·within the limits of the city and construct other works necessary and expedient to the proper completion and main tenance of its road.

The plaintiff alleged that the defendant, in 1874, erected an engine house and machine shop on a parcel of land immediately adjoining its church edifice, and had since used them in such a way as to disturb, on Sundays and other days, the congregation assembled in the church, to interfere with religious exercises therein, break up its Sunday schools, and destroy the value of the building as a place of public worship. It therefore brought the present suit in the Supreme Court of the District for the damages it had sustained. The defendant pleaded the general issue.

On the trial evidence was given to show that the Fifth Baptist Church had owned and used the premises described as a place of worship since 1857; that the present church building was begun in 1867, and since 1868 or 1869 had been continuously occupied by the church as its house of worship; that in 1872 the defendant erected upon a parcel of ground immediately adjoining the premises on the west, and from April, 1874, till the commencement of this suit, maintained, an engine house and machine shop, where a large number of locomotives and steam engines were housed and their fires made, and to and from which the engines were propelled, and in which they were coaled, watered, repaired, and otherwise used; that when the ground was first broken for the erection of these works the plaintiff advised the company that, if put there, they would prove to be a nuisance and ruinous to the plaintiff's interest, and protested against their erection; that the company, however, paid no heed to this protest, but proceeded to erect the

works upon the building line of its own premises within five and a half feet from the church edifice, and constructed upon the engine house sixteen smokestacks, lower in height than the windows of the main room of the church; that the nearest of the smokestacks was less than sixty feet from the windows, and the others were in a semicircular curve, at gradually increasing distances; that during this period—from April, 1874, to the commencement of the present suit—the plaintiff was accustomed to have on every Sabbath day Sunday school exercises in the morning, preaching in the forenoon, and preaching in the evening; and that religious services were also held in it on Wednesday evening of every week, and on the first Tuesday and Friday evenings of every month, and at intervals protracted religious meetings were held in it every night in the week except Saturday night; that during this period these services were habitually interrupted and disturbed by the hammering noises made in the workshops of the company, the rumbling of its engines passing in and out of them, and the blowing off of steam; that these noises were at times so great as to prevent members of the congregation, sitting in parts of the church farthest from the shops, from hearing what was said; that the act of blowing off steam occupied from five to fifteen minutes, and frequently compelled the pastor of the church to suspend his remarks; that this was of habitual occurrence, during the day and at night, and on Sundays as well as other days; and that in the summer time, when the windows of the church were opened for air, smoke, cinders, and dust were blown from the smokestacks through the windows of the church, settling upon the pews and furniture, and soiling the clothes of the occupants, accompanied by an offensive odor, which greatly annoyed the congregation.

Evidence was also given to show that the railroad company, which was authorized to lay its track only along Virginia avenue in this city, had constructed a side track from the avenue to its workshops, crossing a part of D street and its sidewalk at a distance of about 100 feet from the door of the church; that the locomotives were allowed to stand at the entrance of its premises with their cow-catchers protruding

several feet beyond the inclosure, and sometimes to stand across the sidewalk along which two-thirds of the congregation are obliged to pass in going to and from the church; that the access to the church was thereby obstructed and rendered dangerous, and on several occasions members had barely escaped being run over by the sudden starting of the locomotives without note or warning; that the congregation had been thereby diminished, and the attendance upon the Sunday school decreased by about one-fourth; that the Sunday school was a source of revenue to the plaintiff, having contributed to the construction and improvement of the church building, and this revenue was proportioned to the attendance thereon; that the property of the plaintiff was nearly ruined for church purposes by the proximity of the works of the defendant, and the noise, smoke, cinders, and dust which they created; that the rental value was ordinarily from $1,200 to $1,600 per annum, but that with the defendant's works adjoining it could hardly be rented at all; and that those works had depreciated the value of the property fifty per cent.

To meet the facts thus established, and as a defence to the action, the railroad company gave evidence to show that it ran about sixty trains a day over its road in the city of Washington during week days, and about ten trains on Sundays; that its locomotives were the best known in the business; that it employed about 200 men, who were all skilful in their particular branches of work, and well-behaved; that in the engine and repair shop no more noise was made than was necessary; that every precaution was taken on Sundays to preserve quiet in the neighborhood of the church; that the main shop of the company was in the city of Baltimore, and the shop and engine house in Washington were used only for making casual and temporary repairs in order to keep the machinery and engines in operation; that the smokestacks were higher than required by the building regulations in force in Washington; that the engine house and workshops were skilfully and carefully constructed with suitable appointments and appliances; that the bells of the locomotives were not rung, nor the whistles sounded, except when an accident was liable to occur; and

that when the engines were brought into the house the steam ordinarily was not blown off but allowed to go down.

The main reliance, however, of the railroad company to defeat the action was the authority conferred upon it by the act of Congress of February 5th, 1867, to exercise the same powers, rights, and privileges in the construction of a road in the District of Columbia, the line of which was afterwards designated, which it could exercise under its charter in the construction of a road in Maryland, with some exceptions, not material here. By its charter it was empowered to make and construct all works whatever which might "be necessary and expedient" in order to the proper completion and maintenance of the road.

The act of Congress provided that the road which the company was authorized to construct should enter the city at such place and pass along such public street or alley to such terminus as might be allowed by Congress, upon the presentation of a survey and map of its proposed location. Subsequently Congress allowed the company to enter the city with its railroad, by one of two routes, as it might select. It selected the one by which the road is brought along Virginia avenue, in front of the church of the plaintiff, to the intersection of South C and West 9th streets.

The testimony of the parties being closed, the plaintiff prayed three instructions to the jury, which were given by the court with additions to each. They were as follows:

First instruction prayed:

"If the jury find from the evidence that the engine house of the defendant is used for receiving its engines when they come into the city after a trip; that after coming into said engine house such engines more or less frequently blow off their steam, and that such blowing off of steam makes a loud and disagreeable noise, and that such engines are put in the stalls in said house, and emit the smoke from their fires through the chimneys of said house, and that the said engine house is used for the purpose of a shop in which to make a certain class of repairs upon the engines and cars of the defendant, and that a loud noise of ham-

mering is created in making such repairs, and that said engine
house is also used to receive coal for coaling the engines of de-
fendant before going out, and that they are all coaled therein,
and also get up their fire and steam therein, and further find that
said house is located so near the church of the plaintiff that the
noises from said engine house can be distinctly heard inside of the
said church, and also that the chimneys of said engine house are
so constructed that the tops thereof are not as high as the tops
of the windows of said church, and shall further find that the
smoke from said chimneys is thrown through said windows into
said church in such quantities and so generally as to be a common
annoyance and inconvenience to the congregation worshipping
therein, and that said noises in said yard of blowing off steam are
of daily and nightly occurrence, and are so distinctly heard in
said church on Sundays, as well as the days of the week, as to
annoy, harass, and inconvenience the congregation when engaged
in divine worship therein, and that they disturb and greatly in-
convenience the congregation in the enjoyment of said building
as a church, then the plaintiff is entitled to recover, provided the
jury find that said church was located upon the spot where it now
is before the defendant established its engine house in its present
position, and provided the jury further find that the annoyance
and inconvenience to said congregation from the smoke and
noises above mentioned occurred within three years before the
date at which this suit was brought, and provided further that
said noises and smoke depreciated the value of the property of
the plaintiff within the period from April 1st, 1874, to March
22d, 1877."

The court granted this prayer and gave the instruction, add-
ing to it a charge, as follows:

"If you find all these facts, then this shop is a nuisance, and a
special annoyance to the congregation that worship in this church.
Every man has a right to the comfortable enjoyment of his own
house, in which enjoyment a neighbor cannot molest him; and
no grant conferred by proper authority upon any corporation to
construct a railroad along the public streets, or to build shops,
can be construed as authorizing that company to construct a
nuisance. If the work is of such a necessary kind that the com-

pany must have it, if the shop is of that character, and yet is a nuisance in the neighborhood, they must find some other place to put it. No legislature has a right to establish a private nuisance."

Second instruction prayed: ·

" The actual amount of pecuniary loss to the plaintiff is not necessarily the rule of damages in actions like the present. In estimating the amount of compensation to the plaintiff for the injury, if any, found to have been sustained by it, the jury may determine the extent of the injury and the equivalent damages, in view of all the circumstances of said injury to said plaintiff, of depreciation in the value of its property during the period embraced in this suit, and of interference with the uses to which said property was devoted by said plaintiff during said period, and of all other particulars, if any, wherein the plaintiff is shown to have been injured during said period, and for which, under the instructions of the court, said plaintiff is entitled to recover."

: This prayer was granted and the instruction given, accompanied with the following charge to the jury:

" That prayer I think is substantially right. The suit is . brought by a congregation duly incorporated, and they have brought an action to recover damages for their inconvenience and discomfort in consequence of the acts of the defendant. It is the personal discomfort more than anything else which is to be considered in regard to the assessment of damages. Now, I can very easily imagine, and it may often happen, that the construction of an improvement such as this might increase the value of property in the vicinity, and I am not sure at all that the erection of this workshop in that neighborhood may not really have increased the intrinsic value of the property belonging to this congregation. The evidence in the case does not, as it seems to me, show that this property has been depreciated by the construction of that workshop. We can imagine, and it is not a far-fetched imagination either, that the effect of such a workshop in that neighborhood might be to collect a population around it, and thus increase the population in that neighborhood, and really enhance the value of property ; and yet the congregation would be entitled to recover damages (although their property might have increased in

value) because of the inconvenience and discomfort they have suf-fered from the use of the shop. · The congregation has the same right to the comfortable enjoyment of its house for church pur-poses that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort which is the primary consideration in allowing damages."

Third instruction prayed:

"If the jury find from the evidence that, among other purposes, the plaintiff's church was used by the said plaintiff as a school-house for the instruction of children on the Sabbath day, and that a revenue was derived from such school, depending for the amount thereof upon the number of children attending said school, and shall also find that the defendant was in the habit of allowing its engines, with steam on and ready to move out over D street, to lie adjacent to the sidewalk of said D street, adjacent to its workshop ·and engine house, and that in consequence of said en-gines being so allowed to occupy such position, the number of pupils attending said school was diminished, and that from the said cause the number of the pupils of the said school was lessened within the period from March 22d, 1874, to March 22d, 1877, then the jury will consider the extent of such special damage to the plaintiff, should they find such special damage an element in mak-ing up their verdict in this case."

This prayer was granted and the instruction given, accom-panied with the following charge:

"I grant that prayer because there is some evidence that this congregation used that church partly for a Sunday school where children are instructed, and that those children were in the habit of contributing, and have contributed, sums of money to the sup-port of the church. A party is entitled to be compensated, not only for actual damages sustained from the acts of the defend-ants; but, in a case like this, is entitled to his damages for a con-tinuous and threatened danger. A man is entitled to recover damages from the owner of an adjoining property ready to tum-ble down upon himself or his family. That is a threatened danger, and although the danger may not have been actually sus-tained, yet people are not to be kept in alarm constantly by a

threat of danger. It may fall upon him at any time, and a court of chancery would direct it to be removed, and on an indictment for a nuisance of that kind it would be removed.

"But in private actions like this, it may be taken into consideration by the jury whether those engines, standing inside the house and passing out and in so frequently as they do, and in that place, produce a reasonable and fair apprehension of danger to persons passing to that church, especially to children passing to Sunday school. You can take that element into your consideration."

To each of these instructions the defendant excepted. It also requested the court to give several other instructions, the purport of which was that if the railroad company constructed its smokestacks on the repair shop in the usual and ordinary manner, and built them as high as required by the building regulations in force in Washington, the plaintiff could not recover for any damage caused by smoke from such smokestacks : that the company possessed the right to select the location in question, and to construct, maintain, and use upon it such engine house and other works as were necessary and expedient for the construction, maintenance and repair of its road and engines, and to occupy the premises for that purpose ; and that if the jury found that the inconveniences complained of were no more nor greater than the natural or probable result of maintaining such engine house and repair shop ; or found that, in the occupation and use of the property and management of its business, the company exercised such reasonable care as a person of ordinary prudence and caution would exercise under the circumstances, it was not liable for any damages ; and that if the company did not use reasonable care in the construction of the smokestacks on the engine house or repair shop, the plaintiff was only entitled to recover interest for three years on the difference between the value of the property, as it would have been if the defendant's smokestacks had been carefully constructed, and the actual value as reduced by the smoke from them ; that the defendant was entitled to construct and use the side track across D street ; and that the plaintiff could not recover, being a corporation, for any inconvenience which mem-

bers of the congregation assembled in its church might suffer from the noise and offensive odors occasioned by the defendant's engines and shops.

The court refused to give these instructions, and the jury found for the plaintiff $4,500 damages, and the judgment entered thereon was affirmed at the general term of the supreme court of the district. To review that judgment the defendant brought the case here on a writ of error.

*Mr. Enoch Totten* for the plaintiff in error.—I. The Baltimore & Potomac Railroad Company was authorized by Congress to maintain the shops complained of, and they were necessary to the conduct of its business. By the act of 18th March, 1869, 16 Stat. 1, the company was authorized to pass along Virginia avenue to the southern terminus of the prescribed line; this terminus was by that act fixed at the junction of West Ninth and South C streets and Virginia avenue. This being the end of the road, the statute must have been passed with the expectation, in the legislative mind, that depots, stations, engine houses and other works would be constructed at or near that point. Power to construct and maintain a railroad necessarily includes power to build depots, stations, side tracks, engine houses, switches, repair shops, &c., &c. *Enfield Toll Bridge Company v. Hartford & New Haven Railroad Company*, 17 Conn. 453; *Black v. Philadelphia & Reading Railroad Company*, 58 Penn. St. 249; *Speer v. Cleveland & Pittsburg Railroad Company*, 56 Penn. St. 325; *Turnpike Company v. Camden & Amboy Railroad Company*, 2 Harr. (N. J.) 314. The power of determining whether or not such works are necessary and expedient, and where they shall be erected, is by the statute confided to the president and board of directors of the company, and when they have once exercised that power in good faith, their judgment is not reviewable, but is conclusive on all authority in this District, except that of Congress. *Ford v. Chicago & North Western Railroad Company*, 14 Wis. 663; *New York & Hudson River Railroad Company v. Kip*, 46 N. Y. 546; *Giesy v. Cincinnati & Zanesville Railroad Company*, 4 Ohio St. 308; *Brainard v. Clapp*, 10 Cush. 6; *Curtis v. Eastern Rail-*

*road Company*, 14 Allen, 55 ; Pierce on Railways, 148, 160, 494 ; *Hawley* v. *Steele*, 6 Ch. Div. 521. It would be difficult to select a location for these works in the city of Washington; or, indeed, in any city, which would be satisfactory to every property owner in the vicinity ; some person or persons would be sure to complain of the noise and smoke. These considerations, when this line was traced and established over this wide street and through this particular portion of the city, must have received due attention from Congress, as well as all these other attendant questions. If the railroad company did not exceed its powers and did not exercise them wantonly or unlawfully, it cannot be mulcted in damages. No action will lie and no recovery can be had for doing that which the law authorizes the party to do, and that cannot be adjudged a nuisance and be held unlawful which the law declares to be lawful. *New York & Erie Railroad Company* v. *Young*, 33 Penn. St. 175 ; *Renwick* v. *Morris*, 3 Hill, 621 ; *Bridge Company* v. *Kirk*, 46 Penn. St. 112 ; *Northern Tr. Company* v. *Chicago*, 99 U. S. 635 ; Angell on Highways, § 237 ; Addison on Torts, § 1040 ; *Porter* v. *North Missouri Railroad Company*, 33 Mo. 158 ; *Navigation Company* v. *Coons*, 6 Watts & Serg. 101 ; *Henry* v. *Pittsburg Bridge Company*, 8 Watts & Serg. 85 ; *Radcliff* v. *Brooklyn*, 4 N. Y. 195 ; *Bellinger* v. *Railroad Company*, 23 N. Y. 42 ; *Moyer* v. *Railroad Company*, 88 N. Y. 351.

The streets of Washington belong to the United States. It cannot be successfully denied that Congress can legalize the presence of smoke, cinders, noises, railroad trains, and locomotive engines on a public street in the city of Washington, where it is conceded all persons may pass and repass at their will and pleasure, if not interrupted by legalized obstructions. This being so, it would be strange indeed if the same inconveniences cannot be legalized by Congress for railroad purposes upon premises adjoining the railroad, which are the private property of the corporation operating the railroad, and which are used in connection with the conduct of its business. If the right to pass through and over this property belonging to the company could be granted, why could not the right be granted also to stop and remain stationary thereon? The

difference might be but slight in the character and extent of the noise, smoke, and other inconveniences, depending upon the number of passing trains on the one hand and on the extent of yard on the other.—II. The rule which the court below laid down respecting damages was wrong. It told the jury that it might assess damages against the railroad company on behalf of the church corporation for the personal inconveniences and discomforts suffered by individuals worshipping in the church. The true rule was laid down by the Supreme Court of Pennsylvania, in the well considered case of *Sparhawk* v. *Railway Company*, 54 Penn. St. 401, on an application to restrain a railroad company from running its cars alongside a church on Sunday. The court says:

" The bill charges an injury, not physical, but mental or spiritual. One which neither deprives the body of rest, refreshment, or health. That this is the nature of the complaint is most evident, from the fact that the disturbing causes are the same, and no greater on Sundays than on other days, and of this there is no complaint. How are we to determine whether the mind is injuriously disturbed or not? To some it is granted that there may be annoyance in the passing of cars on Sundays. To others it would be but an agreeable sound. To many it would be an annoyance because of their views of the Sabbath. But, as already said, that is not in this case, for want of power in this form to take cognizance of it. It is not possible, in my judgment, to establish a material injury, where alone at most the mind is disturbed without the slightest bodily effect or interference with ordinary comfort. It is but an inconvenience incident to the situation, and not the subject of an adjudication in equity. . . .

" Progress will not be stopped to accommodate anybody's convenience. It must yield in consideration of our interests in the thousand advantages in other respects of city life. We should not attribute the fault in our own position to faults in others."

*Mr. R. T. Merrick* and *Mr. J. J. Darlington* for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

If the facts are established which the evidence tended to

prove, and from the verdict of the jury we must so infer, there can be no doubt of the right of the plaintiff to recover. The engine house and repair shop of the railroad company, as they were used, rendered it impossible for the plaintiff to occupy its building with any comfort as a place of public worship. The hammering in the shop, the rumbling of the engines passing in and out of the engine house, the blowing off of steam, the ringing of bells, the sounding of whistles, and the smoke from the chimneys, with its cinders, dust, and offensive odors, created a constant disturbance of the religious exercises of the church. The noise was often so great that the voice of the pastor while preaching could not be heard. The chimneys of the engine house being lower than the windows of the church, smoke and cinders sometimes entered the latter in such quantities as to cover the seats of the church with soot and soil the garments of the worshippers. Disagreeable odors, added to the noise, smoke, and cinders, rendered the place not only uncomfortable but almost unendurable as a place of worship. As a consequence, the congregation decreased in numbers, and the Sunday school was less numerously attended than previously.

Plainly the engine house and repair shop, as they were used by the railroad company, were a nuisance in every sense of the term. They interfered with the enjoyment of property which was acquired by the plaintiff long before they were built, and was held as a place for religious exercises, for prayer and worship; and they disturbed and annoyed the congregation and Sunday school which assembled there on the Sabbath and on different evenings of the week. That is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrong-doer, and when the cause of the annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance. *Crump* v. *Lambert*, L. R. 3 Eq. 409.

The right of the plaintiff to recover for the annoyance and discomfort to its members in the use of its property, and the liability of the defendant to respond in damages for causing

them, are not affected by their corporate character. Private corporations are but associations of individuals united for some common purpose, and permitted by the law to use a common name, and to change its members without a dissolution of the association. Whatever interferes with the comfortable use of their property, for the purposes of their formation, is as much the subject of complaint as though the members were united by some other than a corporate tie. Here the plaintiff, the Fifth Baptist Church, was incorporated that it might hold and use an edifice, erected by it, as a place of public worship for its members and those of similar faith meeting with them. Whatever prevents the comfortable use of the property for that purpose by the members of the corporation, or those who, by its permission, unite with them in the church, is a disturbance and annoyance, as much so as if access by them to the church was impeded and rendered inconvenient and difficult. The purpose of the organization is thus thwarted. It is sufficient to maintain the action to show that the building of the plaintiff was thus rendered less valuable for the purposes to which it was devoted.

The liability of the defendant for the annoyance and discomfort caused is the same also as that of individuals for a similar wrong. The doctrine which formerly was sometimes asserted, that an action will not lie against a corporation for a tort, is exploded. The same rule in that respect now applies to corporations as to individuals. They are equally responsible for injuries done in the course of their business by their servants. This is so well settled as not to require the citation of any authorities in its support.

It is no answer to the action of the plaintiff that the railroad company was authorized by act of Congress to bring its track within the limits of the city of Washington, and to construct such works as were necessary and expedient for the completion and maintenance of its road, and that the engine house and repair shop in question were thus necessary and expedient; that they are skilfully constructed; that the chimneys of the engine house are higher than required by the building regulations of the city, and that as little smoke and noise are caused as the nature of the business in them will permit.

In the first place, the authority of the company to construct such works as it might deem necessary and expedient for the completion and maintenance of its road did not authorize it to place them wherever it might think proper in the city, without reference to the property and rights of others. As well might it be contended that the act permitted it to place them immediately in front of the President's house or of the Capitol, or in the most densely populated locality. Indeed, the corporation does assert a right to place its works upon property it may acquire anywhere in the city.

Whatever the extent of the authority conferred, it was accompanied with this implied qualification, that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others in their property. Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion. The great principle of the common law, which is equally the teaching of Christian morality, so to use one's property as not to injure others, forbids any other application or use of the rights and powers conferred.

Undoubtedly a railway over the public highways of the District, including the streets of the city of Washington, may be authorized by Congress, and if, when used with reasonable care, it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars with the noises and disturbances necessarily attending their use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is *damnum absque injuria.* The private inconvenience in such case must be suffered for the public accommodation.

But the case at bar is not of that nature. It is a case of the use by the railroad company of its property in such an unreasonable way as to disturb and annoy the plaintiff in the occupation of its church to an extent rendering it uncomfortable as a place of worship. It admits indeed of grave doubt whether Congress could authorize the company to occupy and use any

premises within the city limits, in a way which would subject others to physical discomfort and annoyance in the quiet use and enjoyment of their property, and at the same time exempt the company from the liability to suit for damages or compensation, to which individuals acting without such authority would be subject under like circumstances. Without expressing any opinion on this point, it is sufficient to observe that such authority would not justify an invasion of others' property, to an extent which would amount to an entire deprivation of its use and enjoyment, without compensation to the owner. Nor could such authority be invoked to justify acts, creating physical discomfort and annoyance to others in the use and enjoyment of their property, to a less extent than entire deprivation, if different places from those occupied could be used by the corporation for its purposes, without causing such discomfort and annoyance.

The acts that a legislature may authorize, which, without such authorization, would constitute nuisances, are those which affect public highways or public streams, or matters in which the public have an interest and over which the public have control. The legislative authorization exempts only from liability to suits, civil or criminal, at the instance of the State; it does not affect any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large.

Thus, in *Sinnickson* v. *Johnson*, 2 Harr. N. J. at 151, it was held by the Supreme Court of New Jersey that an act of the legislature authorizing an individual to erect a dam across a navigable water constituted no defence to an action for damages for an overflow caused by the dam.

"It may be lawful," said the court, "for him [the grantee of the power] and his assignees to execute this act, so far as the public interests, the rights of navigation, fishing, &c., are concerned, and he may plead, and successfully plead, the act to any indictment for a nuisance, or against any complaint 'for an infringement of the public right, but cannot plead it as a justification for a private injury which may result from the execution of the statute."

In *Crittenden* v. *Wilson*, 5 Cow. 165, it was held by the Supreme Court of New York that an act authorizing one to build a dam, on his own land, upon a creek or river which was a public highway, merely protected him from indictment for a nuisance. If, said the court, there had been no express provision in the act for the payment of damages, the defendant would still have been liable to pay them, and the effect of the grant was merely to authorize the defendant to erect a dam, as he might have done, if the stream had been his own, without a grant. In such a case he would have been responsible in damages for all the injury occasioned by it to others.

In *Brown* v. *Cayuga, &c., Railroad Company*, 12 N. Y. 486, the company was sued for overflowing plaintiff's land by means of a cut through the banks of a stream which its road crossed. It pleaded authority by its charter to cross highways and streams, and that the cut in question was necessary to the construction and maintenance of the road. But it was held that the company was liable for damages caused.

"It would be a great stretch," said the court, "upon the language, and an unwarrantable imputation upon the wisdom and justice of the legislature, to hold that it imports an authority to cross the streams in such a manner as to be the cause of injury to others' adjoining property."

And so the court adjudged that the company was under the same obligation as a private owner of the land and stream, had he bridged it; and that the right granted to bridge the stream gave no immunity for damages which the excavation of its banks for that purpose might cause to others.

In *Commonwealth* v. *Kidder*, in the Supreme Court of Massachusetts, 107 Mass. 188, a statute of that State authorized the storage, keeping, manufacture, and refining of crude petroleum or any of its products in detached and properly ventilated buildings, specially adapted to that purpose; and it was held that it did not justify the refining of petroleum at any place, where a necessary consequence of the manufacture was the emission of vapors which constitute a nuisance at common law by their unwholesome and offensive nature.

Numerous other decisions from the courts of the several States might be cited in support of the position that the grant of powers and privileges to do certain things does not carry with it any immunity for private injuries which may result directly from the exercise of those powers and privileges.

If, as asserted by the defendant, the noise, smoke, and odors, which are the cause of the discomfort and annoyance to the plaintiff, are no more than must necessarily arise from the nature of the business carried on with an engine house and workshop as ordinarily constructed, then the engine house and workshop should be so remodelled and changed in their structure as to prevent, if that be possible, the nuisance complained of ; and if that be not possible, they should be removed to some other place where, by their use, the plaintiff would not be thus annoyed and disturbed in the enjoyment of its property. There are many places in the city sufficiently distant from the church to avoid all cause of complaint, and yet sufficiently near the station of the company to answer its purposes.

There are many lawful and necessary occupations which, by the odors they engender, or the noise they create, are nuisances when carried on in the heart of a city, such as the slaughtering of cattle, the training of tallow, the burning of lime, and the like. Their presence near one's dwelling-house would often render it unfit for habitation. It is a wise police regulation, essential to the health and comfort of the inhabitants of a city, that they should be carried on outside of its limits. Slaughter-houses, lime-kilns, and tallow-furnaces, are, therefore, generally removed from the occupied parts of a city, or located beyond its limits. No permission given to conduct such an occupation within the limits of a city would exempt the parties from liability for damages occasioned to others, however carefully they might conduct their business. *Fish* v. *Dodge*, 4 Denio, 311.

The fact that the smokestacks of the engine house were as high as the city regulations for chimneys required, is no answer to the action, if the stacks were too low to keep the smoke out of the plaintiff's church. In requiring that chimneys should have a certain height, the regulations did not prohibit their

being made higher, nor could they release from liability if not made high enough. It is an actionable nuisance to build one's chimney so low as to cause the smoke to enter his neighbor's house. If any adjudication is wanted for a rule so obvious, it will be found in the cases of *Sampson* v. *Smith*, 8 Sim. 271, and *Whitney* v. *Bartholomew*, 21 Conn. 212.

The instruction of the court as to the estimate of damages was correct. Mere depreciation of the property was not the only element for consideration. That might, indeed, be entirely disregarded. The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated. The property might not be depreciated in its salable or market value, if the building had been entirely closed for those purposes by the noise, smoke, and odors of the defendant's shops. It might then, perhaps, have brought in the market as great a price to be used for some other purpose. But, as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages. As with a blow on the face, there may be no arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which the jury may measure.

*Judgment affirmed.*