TWENTY-SECOND CORPORATION OF CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS v. OREGON SHORT LINE RAILROAD COMPANY.

No. 2024. Decided July 6, 1909 (103 Pac. 243).

1. EMINENT DOMAIN—ACTION BY LANDOWNER—NOISE IN OPERATION OF RAILROAD. The interference with religious services by the annoyance from the noises in the rightful operation of a railroad and train yards near a church, without any physical interference with the church property, does not give the religious society a right of action for damages against the railroad company, under the provision of Const. art. 1, section 22, that "private property shall not be taken or damaged for public use without just compensation." 1 (Page 244.)

2. NUISANCE—PRIVATE NUISANCE—NOISE FROM OPERATION OF RAILROAD. The interference with religious services by the annoyance from the noises in the rightful operation of a railroad and train yards near a church, without any physical interference with the church property, is not a private nuisance giving the religious society a cause of action against the railroad company. (Page 250.)

3. APPEAL AND ERROR—REVIEW—THEORY OF TRIAL IN LOWER COURT. Where an action was tried in the lower court as for damages to property without just compensation, a judgment for plaintiff cannot be sustained on review, on the theory that the acts complained of constituted a private nuisance. (Page 252.)

---

1 Kimball v. Salt Lake City, 32 Utah 253, 90 Pac. 395, 10 L. R. A. (N. S.) 483, 125 Am. St. Rep. 859; Hempstead v. Salt Lake City, 32 Utah 261, 90 Pac. 397.

4. NUISANCE—ACTIONS FOR DAMAGES—QUESTION FOR JURY. The question whether the excessive noises made in the operation of railroad trains is a nuisance to adjacent property owners is one of fact and not of law. (Page 254.)

APPEAL from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Action by the Twenty-Second Corporation of the Church of Jesus Christ of Latter-Day Saints against the Oregon Short Line Railroad Company.

Judgment for plaintiff, defendant appeals.

REVERSED.

*P. L. Williams, Geo. H. Smith, Jno. G. Willis,* and *H. B. Thompson* for appellant.

*Moyle & Van Cott* and *E. C. Ashton* for respondent.

### APPELLANTS' POINTS.

Where the laws or constitutional provisions of sister states have been adopted which have previously been construed by the supreme courts of such states, they are presumed to have been adopted in the light of their interpretation, and take with them the construction placed upon them: *People v. Ritchie,* 12 Utah 180, 193. Considering the fact that a provision of this general character was embodied in the Railway Clause Consolidation Act, as early as 1845 (8 and 9 Vict., Ch. 20, sec. 6), and had been adopted and construed in many states of the Union prior to the adoption of the Utah Constitution, in May, 1895, we must assume that its adoption was not a matter of original inspiration, but was suggested because of its existence elsewhere. In 1895, by reference to Lewis on Eminent Domain (2d Ed.), vol. 1, sec. 22 *et seq.,* we find the provision adopted and construed prior to the adoption of the Utah Constitution, *viz.*: Penna.:

—1873, Art. XVI, secs. 3 & 8,—9 Atl. 871,—1887; Ill.:— 1870, Art. II, sec. 13,—102 Ill. 64,—1884; Colo.:—Art. II, sec. 15,—22 Pac. 814,—1889; Mo.:—1875, Art. II, sec. 21,—20 S. W. 658,—1892; W. Va.:—1872, Art. III, sec. 9; Georgia:—1877, Art. I, sec. 3,—11 S. E. 582,— 1890. We might add that we have failed to find any contrary construction which existed prior to 1895. The framers of the Constitution, therefore, must have intended the section to bear the construction which had generally been given it at the time they adopted it; otherwise they would have used different language.

FRICK, J.

This is an action for damages alleged to have been caused by the operation of appellant's trains to respondent's property used for church and other purposes.

The material facts, briefly stated, are, in substance as follows: Respondent, in 1890, erected a certain building forty by sixty feet, to which it added, in 1900, what is termed "the annex," forty by seventy feet. These buildings are used for church purposes; that is, the usual Sunday and week day services are held in them, and, in connection therewith, Sunday school and other religious exercises were also conducted therein. The buildings were also frequently used for entertainments, theatricals, dances, and other gatherings, so that the buildings were used for religious purposes several times on each Sunday and sometimes one or more times during the week for other purposes. The secular meetings were held mostly on evenings, while on Sundays the religious services were conducted in the forenoons, afternoons, and evenings. Prior to 1890, when the first building was erected, the appellant, or its predecessor in interest, had constructed and operated a certain line of railroad west of and in what is known as Fourth West Street running north and south. When the railroad was first built, but one track was laid. Some years thereafter, the evidence does not disclose when, another track was added. These tracks were west of what we shall, for convenience, term the chruch property,

between three hundred and four hundred feet. The church property, upon which the buildings in question are located, consists of a parcel of ground five by fifteen rods running north and south fronting on Third North Street, which runs east and west. The westerly side line of this parcel of ground is fifteen rods, or 247 1-2 feet, east of the east margin of Fourth West Street. From this it will be seen that there was a parcel of ground fifteen rods in length between the church property and the street on which the railroad tracks were laid. About the year 1903 appellant obtained a strip of ground, by purchase or otherwise, off the west end of the fifteen rod strip, aforesaid, and also, by virtue of an ordinance, obtained permission from the mayor and city council of Salt Lake City to construct additional tracks in Fourth West Street. These tracks were laid in 1905 or 1906. The evidence disclosed that there were fourteen tracks that were operated by appellant. The nearest of these tracks is one hundred and five feet west from the west side line of the church property, and one hundred and fifteen feet west from the west side of the buildings thereon. The other tracks are all to the west; the farthest being between three hundred and four hundred feet distant. The station or depot of appellant is some blocks south, while its yards, which are termed "the north yards," repair and car shops are a half or three-quarters of a mile north of said buildings. The additional tracks before referred to were constructed to accommodate the increased railway traffic and to permit appellant to break up and make up its freight and passenger trains, after arriving, and before departing, in the north yards. In this way many trains, or parts of trains as well as switch engines, pass north and south over the tracks immediately west of the church buildings each day and night. These engines made noises by ringing the bells and sounding the whistles in passing north and south along First West Street, and especially in crossing Third North Street, which, as we have said, runs east and west in front of the church buildings. It is alleged that the noises emanating from

36 Utah—16

the engines as aforesaid disturbed the meetings and exercises that were conducted in said buildings and caused great annoyances to the speakers and singers, and at times interfered with the music and was a great annoyance to those in attendance at the meetings.

To avoid, as far as possible, any misconception with regard to what caused the interferences and annoyances, we shall give the statements of the witnesses in their own language. Mr. Nebeker, who was, perhaps, as familiar with the prevailing conditions as any one, when asked to state what caused the disturbances and annoyances to the speakers and attendants at the various church and other meetings, said it was "the whisling of engines, the puffing of the engines, and the ringing of bells, and the jostling of the cars, switch engines, switching of the cars, and the noises caused by the momentum of the train passing." This witness gives ten specific instances by giving the dates when either the speakers or singers, or some ceremony, was interrupted by the noises referred to by him. The witness, however, says that the disturbances and annoyances occurred at numerous other times; but he was unable to give any specific dates. Mr. Archer, another witness, could not give specific dates, but said that the disturbances and annoyances were frequent and were caused by the "passing of trains and the noise consequent thereto, the whistling and puffing of the engines, and the noise of the cars passing." Mrs. Solomon, another witness, said the disturbances were occasioned by the "trains passing and engines whistling, trains making a rumbling noise and puffing." Mr. Holmes said that the disturbances arose from noises from "the movements of the trains, the noise of the trains, the whistling and the running of the engines and the cars." Mr. Morris said the disturbances were caused "by noises made by the frequent passing of the trains and the shrieking of whistles and the ringing of bells." Mr. Beesley, when asked what caused the disturbances and annoyances said: "It is the passing of railroad trains on the Oregon Short Line tracks and the noises attendant to the screeching of the whistles and the ringing of bells." The

other witnesses, Mr. Blake, Mrs. Davis, Miss Davis, Mr. Paul, Mr. Hardy, Miss Thomas, Mr. Thomas, Mr. and Miss Rees, gave the cause of the disturbances in about the same language. Mr. Rees, however, spoke of trains and engines sometimes stopping at or near Third North street and whistling for or when signals were given. These witnesses also said that the interruptions would sometimes occur from four to ten times during a meeting lasting two hours, and, they said that the average number of interruptions at a meeting would be four or five and would be from ten to fifteen or twenty seconds duration. Mr. Nebeker gave one instance when smoke from an engine entered the building through the open windows and he says "the smoke was very offensive." This, as far as we are able to discover from the record is the only witness who specially speaks of the smoke. It may have been incidentally mentioned by some others; but, if so, we have failed to discover it. This, for reasons hereafter stated, is, however, not of great importance. The witnesses were, by the trial court, permitted to go into great detail with respect to the ceremonials and other religious exercises that were conducted in the buildings and the interruptions that took place from the causes and in the manner stated, and they all testified that the noises were very disagreeable and annoying. Some of them characterized them as "humiliating" in view of the sacredness of the ceremonies that were conducted from time to time.

Upon the foregoing facts the court, after telling the jury that no recovery could be had for the use of the two tracks first laid, instructed the jury as follows:

"But the defendant is liable for the damages, if any, occasioned by reason of the matters complained of involved in the operation of the additional tracks and yards constructed in 1906; and you are instructed that, although the defendant may have operated its engines and cars engaged in such additional operations as above defined in a careful and prudent manner, which manner of operation is not disputed, it is nevertheless liable for the damage, if any is proven by the evidence, to the plaintiff resulting from the noises involved in such additional operation, such as the blowing of the whistle of the engines, the discharging of steam, the puffing of engines, and the rumbling and jostling together of cars. No question of negligence is involved in this action."

Upon the instructions given the jury found for the respondent, assessing the damages at four thousand dollars. The court entered judgment on the verdict, and, after refusing a new trial, the case is brought to this court on appeal.

The appellant excepted to the foregoing instruction, and the principal question arising on this appeal relates to the propositions of law contained in said instruction. We remark that appellant excepted to the instruction as a whole. If it were not for the fact that the other parts of the instruction did not contain anything except a restatement of matters also contained in other instructions, and thus what was said by the court was merely introductory to the real proposition of law contained in the foregoing quotation, and that from the entire record it is palpable that the court's attention was specifically directed to the propositions of law contained in that part of the instruction now objected to, and that the court deliberately stated the law applicable to the facts as above indicated, we might be powerless to review the instruction. In view of the foregoing conditions, however, we feel constrained to give the appellant the benefit of the doubt, and shall review the case upon the propositions of law stated in the instruction excepted to.

It will be observed that in this case no question is raised with respect to interruptions of ingress or egress to and from the property alleged to have been damaged; nor is there any claim that there was any physical injury to the buildings or property; nor do the facts make a case where the erection of coal chutes, roundhouses, machine or repair shops, water tanks, or other like structures in close proximity to church buildings, constituting a nuisance, is complained of. The record presents a case where the only interferences and annoyances complained of affect those using the buildings for a special purpose, and the interferences and annoyances arise wholly out of the noises incident to the operation of locomotive engines, trains of cars, and switch engines upon railroad tracks which were lawfully laid. Appellant contends that under those cir-

cumstances respondent is simply suffering from the ordinary interferences and annoyances which are incident to the operation of trains over a railroad track or tracks lawfully constructed, and that all these are suffered by all the residents along the railroad track in common with respondent, and hence no recovery can be had. Respondent, however, contends that our Constitution (article 1, sec. 22) provides that "private property shall not be taken or damaged for public use without just compensation," and that this provision is broad enough to authorize a recovery in view of the evidence in this case. Similar provisions are found in the Constitutions of nearly half of the different states of this Union, and have been the subject of frequent and learned discussions by the appellate courts in a great number of cases since the provision was first adopted in 1870 by the state of Illinois. The leading case in Illinois in which a constitutional provision just like the one quoted above was construed is *Rigney v. City of Chicago,* 102 Ill. 64. In a similar case, entitled *Chicago v. Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638, the construction placed upon the provision contained in •the Illinois Constitution in the Rigney Case was upheld by the Supreme Court of the United States. In the Rigney Case it was in effect held that the clause in the Constitution is limited to damages arising from some physical injury to property, or from some physical disturbance or interference with some property right, as contradistinguished from mere annoyance. The extent to which the so-called "damage clause" in the Illinois Constitution is given effect is perhaps best illustrated in a much later case by the Supreme Court of Illinois, entitled *Aldrich v. Metropolitan, etc., R. Co.,* 195 Ill. 456, 63 N. E. 155, 57 L. R. A. 237, in which it is held, in effect, that interferences like those in question in the case at bar do not give a right to recover in an independent action.

The Supreme Court of Washington, in a recent case, has had occasion to pass upon the "damage clause" of the Constitution of that state. (*Smith v. St. P., M. & M. Ry.,* 39 Wash. 355, 361, 362, 81 Pac. 840, 70 L. R. A. 1018, 109

Am. St. Rep. 889.) In that case the cases from the different jurisdictions where the damage clause has been construed and passed upon are very ably reviewed and discussed. The court, in passing upon the damage clause and what is included within it, said:

"The jarring of the earth of respondents' lots and the casting of soot and cinders thereupon, and the emission of smoke physically injuring property, are injurious physical effects to the *corpus* of respondents' property, which, we think, come within the scope of the term 'damaged,' as used in the constitutional provision. . . . But the ringing of bells, sounding of whistles, rumbling of trains, and other usual noises, and the emission of smoke, gases, fumes, and odors are necessarily incidental to the proper operation of the road, and, when not resulting from negligence, are such consequential injuries as must be held to have been anticipated by any one acquiring property in or about such a city, and are regarded as *damnum absque injuria.*"

In the following cases damage provisions similar to ours are found either in the Constitutions or in the statutes of the several states and are thoroughly discussed and applied: *Austin v. Augusta Term. Ry.*, 108 Ga. 671, 34 S. E. 852, 47 L. R. A. 755; *Penn. Ry. Co. v. Lippincott*, 116 Pa. 472, 9 Atl. 87, 2 Am. St. Rep. 618; *Eachus v. Los Angeles, etc., Ry. Co.*, 103 Cal. 614, 37 Pac. 750, 42 Am. St. Rep. 149; *Carroll v. Wis. Cent. Ry.*, 40 Minn. 168, 41 N. W. 661; *Beseman v. Penn. Ry.* Co., 50 N. J. Law, 235, 13 Atl. 164; *Gilbert v. Greeley, etc.*, Ry., 13 Colo. 501, 22 Pac. 814; *Brown v. Bd. of Supervisors*, 124 Cal. 274, 57 Pac. 82; *Van DeVere v. Kansas City*, 107 Mo. 83, 17 S. W. 695, 28 Am. St. Rep. 396; *Louisville N. T. Co. v. Lellyett*, 114 Tenn. 368, 85 S. W. 881, 1 L. R. A. (N. S.) 49.

In the foregoing cases it would seem that about all the cases upon the subject were examined, reviewed, and, where deemed necessary, distinguished. In all of them it is in effect held that the damage clause of the Constitution was not intended to, nor does it, cover actions for annoyances from noises and the like arising from the operation of railroads. It seems needless to cite the many cases referred to in the cases above cited, nor could we add anything to what

is there said upon the question. It seems to us, however, that the clause in the Constitution that private property shall not be taken nor damaged clearly means that some physical injury or damage to the property itself shall be committed, and does not include something which merely affects the senses of the persons who use the property. To obtain relief for the latter consequences in a case of nuisance, no constitutional nor statutory enactment was necessary. Indeed, counsel for respondent, in effect, concede this on page sixteen of their brief, where it is said: "Respondent in this case has never contended that the constitutional provision heretofore referred to, 'that private property shall not be taken or damaged for public purposes without just compensation,' creates any new right." If this be so, then, in order to bring the case within the damage clause of the Constitution, there must be some physical interference with the property itself or with some easement which constitutes an appurtenant thereto. This, to a certain extent at least, is illustrated and applied in the recent cases of *Kimball v. Salt Lake City,* 32 Utah 253, 90 Pac. 395, 10 L. R. A. (N. S.) 483, and *Hempstead v. Salt Lake City,* 32 Utah 261, 90 Pac. 397. Buildings and property may be physically affected by jarring or by the throwing of cinders or ashes thereon in considerable or large quantities, and possibly otherwise; but it is not easy to perceive how property or buildings of any kind can be physically injured by mere noises, however disagreeable or "humiliating" they might be to the occupants of the property. Such noises, no doubt, can become a disturbance and an annoyance to all those who for any purpose may have occasion to go upon, or with others make some use of, certain buildings or property; but the effect would be to or upon the sensibilities of such persons, and not to or upon the property as such.

But it is contended by respondent's counsel that numerous cases can be found where damages have been allowed for disturbances such as are made apparent by this record. It may be conceded that there are some cases, notably from Nebraska and Texas, which seem to go to this extent.

(*Omaha & N. P. Ry. Co. v. Janecek,* 30 Neb. 276, 46 N. W. 478, 27 Am. St. Rep. 399, and *Gainesville, H. & W. Ry. Co. v. Hall,* 78 Tex. 169, 14 S. W. 259, 9 L. R. A. 298, 22 Am. St. Rep. 42, are such cases.) While the Nebraska decision does seem to be based upon this ground, it nevertheless appears from that case that at least some physical injury was caused to the property itself apart from mere noises. Moreover, a critical examination of the cases cited by the Nebraska Supreme Court in support of its decision will disclose that in nearly all, if not all, of them, some easement or appurtenance to the property in question was physically interfered with, and in that way the cases in fact are within the rule laid down in the Washington case from which we have quoted. The Texas case is an extreme case. The railroad track as laid within less than forty feet from a dwelling house, and it thus left the dwelling as though it had been erected on an ordinary railroad right of way. The decision in that case, however, seems to be squarely based upon the ground that noises which affected the owner's enjoyment of the property came within the damage clause of the Constitution. By reference to a much later case emanating from the same court, it will, upon a critical examination, be seen that it is not so clear that even in Texas a recovery may be had for all annoyances arising from the mere operation of a railroad. (See *Rainey v. Red River & T. S. Ry.,* 99 Tex. 276, 89 S. W. 768.) That case is also reported in 80 S. W. 95, where it was decided by the Texas Court of Civil Appeals, from which court it was taken to the Supreme Court of Texas, and the judgment of the lower court was reversed, as appears from the citation first given. The question involved there was a nuisance which was created and maintained by the erection of a roundhouse and machine shops.

The legal and equitable principles involved in cases relating to the construction and maintenance of machine shops, roundhouses, and like structures have no application to the mere operation of a railroad, as the following cases, which are cited and relied upon by counsel for respondent, clearly

show. The leading case cited is the · case of *Baltimore &*
*Potomac Ry. v. Fifth Bap. Church,* 108 U. S. 317, 2 Sup.
Ct. 719, 27 L. Ed. 739. The decision in that case is square-
ly based upon the fact that the railroad company, in erecting
and maintaining machine and repair shops and a round-
house in close proximity to a church, caused a nuisance, in
view that the church had been erected and used for a long
time prior to the erection of the railroad shops. It was made
to appear that a large number of chimneys or smokestacks
were so constructed as to pour the smoke and offensive odors
arising therefrom directly through the windows into the
church building, and that the noises emanating from the
shops were such as to render worship in the church almost
impossible. The court, in substance, held that the railroad
company had no right to erect its shops at such a place; that
such shops could and ought to be erected and maintained
at some other place, where there maintenance would result
in the least possible annoyance to others and not under the
very windows of a church. The court, in the course of the
opinion, however, clearly distinguishes that ·case from one
like the case at bar. At page 331 of 108 U. S., and page
728 of 2 Sup. Ct. (27 L. Ed. 739), Mr. Justice Field, in
speaking for the court, says:

"Undoubtedly a railway over the public highways of the district,
including the streets of the city of Washington, may be authorized
by Congress, and if, when used with reasonable care, it produces
only that incidental inconvenience which unavoidably follows the
additional occupation of the streets by its cars with the noises
and disturbances necessarily attending their use, no one can com-
plain that he is incommoded. Whatever consequential annoyance
may necessarily follow from the running of cars on the road with
reasonable care is *damnum absque injuria.* The private inconven-
ience in such case must be suffered for the public accommodation."

The case of *Chicago G. W. Ry. v. First M. E. Church,*
102 Fed. 85, 42 C. C. A. 178, 50 L. R. A. 488, in principle
is precisely like the case in 108 U. S. 317, 2 Sup. Ct. 719,
27 L. Ed. 739, just referred to, and for that reason the
United States Court of Appeals for the Eighth Circuit fol-
lowed it. The opinion is written by Mr. Justice Wilkes of

the Supreme Court of Tennessee in the case of *Louisville
N. T. Ry. Co. v. Lellyett, supra,* and while he discusses the
damage clause of the Constitution, he likewise draws the
distinction with respect to the principles involved between
annoyances and interferences which arise from the operation
of machine shops and other like structures and those arising
from the operation of railroad trains. After reading the
opinion in that case, but little, if any, room for discussion
is left. In view that what is said in the opinion by Mr.
Justice Wilkes in a large degree applies to the case at bar,
we take the liberty to quote somewhat at length from what
is said at pages 400 and 401 of 114 Tenn., and page 889
of 85 S. W. (1 L. R. A. [N. S.] 49), as follows:

"When the first tracks were laid, the property now in con-
troversy, as well as that contiguous, was vacant. With the growth
of the city this space has been occupied and residences have been
erected. Thus both the travel and traffic of the roads, as well as
the growth of the locality, have gone hand in hand. We are of the
opinion that, in so far as the growth and increase of travel and
traffic into and through the station has brought discomfort to
plaintiff, he is without remedy. In other words, the roads have
the right to accommodate their increasing traffic and travel without
liability, so long as their trains are operated without negligent
disregard of the comfort and usable value of the plaintiff's property,
and for this purpose to lay such additional tracks, side tracks, and
switches into and through the station as may be required to ac-
commodate such travel and traffic, both passenger and freight;
and it is only for the additional conveniences of roundhouses, sand-
houses, coal bins, coal chutes, and the switchyards and tracks nec-
essary to operate such additional conveniences, which might be
located elsewhere, though not so advantageously, perhaps, that plain-
tiff can complain, if they materially damage the plaintiff's prop-
erty."

We have already shown that nothing is made to appear
from the record before us that respondent is inter-
fered with or annoyed by any shops or other struc-
tures which might be located and operated else-
where; but the interferences and annoyances are all attrib-
uted to the operation of the additional tracks which counsel
for respondent concede were necessary to accommodate the
increased traffic of appellant's railroad. Nor is there any

claim made of negligent management or operation, nor
that the noises and disturbances by ringing bells and sound-
ing whistles were unnecessarily or willfully done.    Neither
is there any proof or claim that the buildings sustained any
physical injury, nor that their use, occupancy, or access
thereto was in any way interfered with except by the noises
occasioned by the operation of the trains.    But it is con-
tended that, although respondent may not recover dam-
ages under the damage clause of the Constitution, it may,
nevertheless, recover for any interference or annoyance
which is caused by what is termed a "private" as contra-
distinguished from a "public" nuisance; that neither the
state nor the city could legally authorize the appellant to
create a private nuisance and permit interference with re-
spondent's rights with impunity.    That neither the state
nor the city could grant any one the right to create or main-
tain a private nuisance with impunity no doubt is sound,
and is conceded to be the law.    The question, however, is,
Does the operation of a railroad by passing of trains,
whether few or many, when operated with ordinary care,
constitute either a public or a private nuisance?    Can the
noises that emanate from moving trains be eliminated with-
out preventing the trains from running at all?    Moreover,
do not such noises affect all who are similarly situated along
the line of the railroad?    If not in the same degree, do
they not affect all to some extent?    If this be so, how can
it be said that in a legal sense such noises constitute a
nuisance either public or private?    The Court of Appeals
of New York, in a comparatively recent case, namely,
*Bennett v. Long Island R. Co.,* 181 N. Y. 431, 74 N. E.
418, in passing upon this point, uses the following language:

"The rumble of trains, the clanging of bells, the shriek of
whistles, the blowing off of steam, the discordant squeak of wheels
in going around curves, the emission of smoke, soot, and cinders,
all of which accompany the operation of steam cars, are undoubtedly
nuisances to the neighboring dwellings in the popular sense; but,
as they are necessarily incident to the maintenance of the road,
they do not constitute nuisances in the legal sense, but are regarded
as protected by the legislative authority which created the cor-

poration and legalized its corporate operations. Nor does the legal nature of such annoyances change as traffic increases them in volume and extent."

This doctrine is referred to and followed in nearly, if not quite, all of the cases we have herein cited. Nor do the following cases cited by counsel for respondent lay down a different doctrine: *Whitney v. Bartholomew,* 21 Conn. 213; *Duncan v. Hayes,* 22 N. J. Eq. 25; *Churchill v. Burlington Water Co.,* 94 Iowa 89, 62 N. W. 646; *Robinson v. N. Y. & E. Ry.,* 27 Barb. (N. Y.) 513; *Blanc v. Murray,* 36 La. Ann. 166; *Equitable C. & F. Co. v. Hersee,* 103 N. Y. 25, 9 N. E. 487.

These are all cases passing on interferences where the business complained of could as well have been conducted at some other place, or the interferences or annoyances were of that character which could be remedied, and hence it was held that the conduct of the business at the place and in the manner it was conducted constituted a private nuisance which could be abated, or for the maintenance of which the complaining party could recover damages. The case at bar, however, did not proceed upon the theory of either a public or a private nuisance. True, counsel for respondent now contend that the judgment may be sustained upon the theory of a private nuisance; but the contention must fail if for no other reason than the one that the case was neither tried nor submitted to the jury upon any such theory. This is made clear from the instruction quoted from at the beginning of this opinion. Indeed, counsel do not claim that there was any willful or negligent conduct in operating the trains over appellant's railroad, nor that the noises were excessive or avoidable. If they had relied upon such a state of facts, the question whether the excessive noises constitute a nuisance or not would necessarily have to be determined as a question of fact and not one of law. (*Requena v. City of Los Angeles,* 45 Cal. 55; *People v. Park, etc., Ry.,* 76 Cal. 156, 18 Pac. 141; *People v. Davidson,* 30 Cal. 379.)

It is true that, in addition to the foregoing cases, there are some in which the courts have held that noises and other interferences arising from the operation of railroad trains are proper elements of damage when they affect the use and enjoyment of property. Among this class of cases are those which relate to the condemnation of property for public purposes, including railroads, where all the property is not taken, but the property not taken is, nevertheless, affected, or where some easement appurtenant to the property not taken is interfered with so as to affect the salable or usable value thereof. In that class of cases noises and similar interferences which may affect the market value of the property not taken are ordinarily permitted to be shown, not as independent elements of damage, but as elements to be considered in connection with all other things which may depreciate the market value of the property interfered with but not taken. *Meyer v. C., W. & N. Ry.*, 68 Wis. 180, 31 N. W. 710, and *Omaha S. Ry. v. Beeson*, 36 Neb. 361, 54 N. W. 557, are cases where the doctrine is illustrated and applied. It is clearly pointed out, however, in those cases, that the interferences from noises and similar agencies cannot be made the subject of independent actions. One of the reasons why such interferences are permitted to be shown in the class of cases referred to is indicated by the Supreme Court of Pennsylvania in *Penn. Ry v. Lippincott, supra.* It is there said that in that class of cases consequential damages may be offset by special benefits, and the property-owner may thus show all matters specially affecting his property or the enjoyment thereof as an offset, or a partial offset, against supposed special benefits accruing to his property by reason of the contemplated improvement.

It may be noticed that our own statute (subdivisions 3 and 4 of section 3598, Comp. Laws 1907) provides for allowances and offsets of this character; but, as pointed out in the Lippincott Case, while such annoyances are proper to be shown in the class of cases last referred to, they, nevertheless, cannot be made the subject of independent ac-

tions for damages. Nor can the owner of property abutting on a street complain because some other street is being interfered with in which he has no special easement, but only the right of passage in common with the public generally, unless, perhaps, such interference constitutes a public nuisance. Nor would a rule which permitted property-owners to recover damages for disturbances from noises arising through the operation of trains either in the public streets (except perhaps by an interference with an easement, in front of the owner's property), or upon ground owned by the railroad company, be either just or equitable. If mere annoyances through noises which are necessarily incident to the conduct of a lawful business in its nature public can be made the subject of damage suits, then we can see no point at which a line may be drawn when such actions may not be maintained. If mere annoyances from noises give a right of action for damages, then every one who is annoyed must be permitted to sue for and recover damages to the extent to which he is affected. The question therefore, in each case, would depend upon the intensity of the noises and the extent of the annoyance. Every one who may live within the radius to which the noises may extend would have a right of action, and the amount of recovery would be graduated by the distance one lived from the source of the noise, unless the noise was diminished by some artificial means. No doubt, in this case the interferences and annoyances are considerable and may be said to be out of the ordinary. The mere fact, however, that men, women, and children use the building in question for worship, for religious edification, for the inculcation of morals, or for amusement, gives them no higher right as an association to sue for and recover damages than it would an individual whose family is occupying a home in the same vicinity.

In the eye of the law property rights are the same by whomsoever occupied or owned. Property dedicated to worship is just as, and no more, sacred than property devoted to any other lawful purpose. An unlawful interference

with property or property rights used for one lawful purpose will receive the same consideration and protection as that used for any other. The fact that the degree of interference while attending church services may be greater, nevertheless it is no different in kind from interference from the same cause to the home. If, therefore, it should be held that noises arising out of the present state of industrial pursuits and business activities shall give a right of action, all enterprises from which annoyances arise must be held liable in actions for damages. There is, there can be, no middle ground; and under our theories of government, grounded upon the fundamental principle of equality before the law, all must either suffer some annoyance, or all who cause them must be held liable for damages. The law seeks for practical as well as just results whenever such are obtainable. The practical way, therefore, out of such a difficulty is that the interferences and annoyances which are common to all—that is, where all suffer from the same kind of interference and annoyance, and the difference of annoyances as between communities or individuals is one of degree merely, and not of kind, and the annoyance is caused by something which is a necessary part of some lawful enterprise which is in its nature public and cannot be shifted from place to place —all must bear the annoyance as best they may. If the respondent can show that blowing whistles, ringing bells, and the rumbling of the trains are avoidable without undue interference with the operation and usefulness of the railroad, or that it is unnecessary to blow the whistles and ring the bells, or that these things are done willfully and for the purpose of interfering with and annoying the persons who are using the buildings for the purposes indicated in the record, then, upon such allegation and proof, the law no doubt will afford some relief. The record, however, simply makes a case where the things complained of emanate from the carrying on of a *quasi* public enterprise which cannot be shifted from place to place, and where the noises are a

mere incident to the business itself, which is conceded to be lawful and carried on with ordinary care.

Respondent has referred us to the case of *Stockdale v. Railroad,* 28 Utah 201, 77 Pac. 849; but there is nothing said in that case which conflicts with or in fact is not in strict harmony with what we have said in this case; nor is there anything in *Railroad Co. v. Board of Education,* 32 Utah 305, 90 Pac. 565, 11 L. R. A. (N. S.) 645, which in any way affects any question which is involved in the case at bar. Under the circumstances disclosed by this record, therefore, we cannot see wherein the appellant has violated any duty or has disregarded or invaded any of respondent's rights. It was error therefore to give the instruction which we have quoted and to permit a recovery thereunder.

All the other assignments, except those relating to the admission of certain evidence, although numerous, are sufficiently covered by what we have said. The assignments relating to the admission of evidence, by reason of the conclusions reached, have become wholly immaterial because they cannot possibly arise in the same way upon a retrial of the case, if one be had.

For the reasons stated, the judgment is reversed, and the cause remanded, with directions to the district court to grant a new trial and to proceed with the case in accordance with the views herein expressed. Appellant to recover costs.

STRAUP, C. J., and McCARTY, J., concur.